INGWALD L. RAMBERG and ELINOR R. RAMBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent CARL A. SIEGEL and JACQUELENE S. SIEGEL, husband and wife, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ramberg v. Commissioner
Docket Nos. 7442-72, 7460-72
United States Tax Court
T.C. Memo 1975-112; 1975 Tax Ct. Memo LEXIS 259; 34 T.C.M. (CCH) 550; T.C.M. (RIA) 750112; April 22, 1975, Filed. Paul W. Steere, for the petitioners in docket No. 7442-72. W. John Sinsheimer, for the petitioners in docket No. 7460-72. Robert J. Chicoine, for the respondent. *260 HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in the joint Federal income tax returns of petitioners Ingwald L. and Elinor R. Ramberg: Year
Amount
1967
$4,633.23
1968
5,094.05
1969
5,258.24 Respondent also determined the following deficiencies in the joint Federal income tax returns of petitioners Carl A. and Jacquelene S. Siegel: Year
Amount
1968
$4,329.00
1969
3,705.00 These cases have been consolidated for the purposes of trial, briefing and opinion. Respondent's position is that of a stakeholder. The sole issue is whether monthly payments of $745 by Ingwald Ramberg to Jacquelene Siegel during 1967, 1968 and 1969, under the terms of a 1963 divorce decree, are includible in Jacquelene Siegel's gross income under section 71(a)[1] and deductible by Ingwald Ramberg under section 215(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Ingwald L. and Elinor R. Ramberg, husband and wife, resided in Seattle, Washington at the *261 time they filed their petition. They filed joint Federal income tax returns for 1967, 1968, and 1969 with the Internal Revenue Service Center at Ogden, Utah. Carl A. and Jacquelene S. Siegel, husband and wife, also resided in Seattle, Washington at the time they filed their petition. They filed joint Federal income tax returns for 1968 and 1969 with the Internal Revenue Service Center at Ogden, Utah. Ingwald L. Ramberg ("Ingwald") and Jacquelene S. Siegel ("Jacquelene") were formerly husband and wife. They resided in the State of Washington during their entire marriage. On March 6, 1962, Jacquelene commenced an action for divorce in the Superior Court of the State of Washington, which culminated in a decree of divorce entered on March 5, 1963. At the time of divorce Ingwald and Jacquelene owned real and personal property, substantially all of which was community property. The community assets to be partitioned between them were the following: (1) An undivided one-half interest in improved industrial real estate in Seattle, Washington, commonly known as the "Mill Engineering and Supply Property"; (2) Family home and furnishings in Seattle, Washington, subject to an outstanding *262 mortgage; (3) Summer home on Orcas Island, San Juan County, Washington; (4) Cash on hand; (5) One-half of a real estate contract vendee's interest in two unimproved waterfront lots on Orcas Island, San Juan County, State of Washington; (6) Interest in Vancouver Gear Works, Vancouver, British Columbia; (7) Interest in Renton Engineering, Renton, Washington; (8) Life insurance on the life of Lee Mantel, issued by Lutheran Brotherhood Life Insurance Company; (9) Interest in Mantel Gear Works partnership. This asset had no value, as its liabilitites and assets had been transferred to the corporation, Mantel Gear Works, Inc.; and (10) 998.5 shares of common voting stock of Mantel Gear Works, Inc., a Washington corporation, constituting one-half of the then-issued and outstanding shares of stock in the corporation. [2]
After protracted negotiations through counsel during the divorce proceedings, Ingwald and *263 Jacquelene entered into a Property Settlement Agreement by means of which they partitioned their community property and provided for the future support of Jacquelene and their children. The Property Settlement Agreement was subsequently approved by the King County Superior Court and its terms were incorporated in the decree of divorce. The divorce decree provides in part: Plaintiff, Jacquelene S. Ramberg, be and she is hereby awarded judgment against the defendant, Ingwald Lee Ramberg, as and for her support the sum of $745.00 per month for the next one hundred twenty-one months, and that such payments shall be made regardless of whether or not the plaintiff remarries, is employed or is otherwise able to support herself. The provision specifying that the periodic payments were to continue notwithstanding Jacquelene's remarriage was inserted at Ingwald's request. He wanted to be certain that she would be financially independent. At the time of the divorce Jacquelene was employed as a receptionist earning $1.25 per hour. It was the intention of Ingwald, his attorney Jay W. Hamilton, [3] his Certified Public Accountant Henry V. Benson, and Jacquelene's attorney John Sweet, that the *264 monthly payments of $745 specified in the Property Settlement Agreement and the decree of divorce were support payments to Jacquelene. All of these individuals were directly engaged in negotiating the Property Settlement Agreement. Prior to signing the Property Settlement Agreement, Jacquelene was advised by her attorney John Sweet on several occasions that these alimony payments would constitute taxable income to her. Accountant Henry V. Benson wrote to Ingwald on July 26, 1963 stating that Jacquelene would be taxable on the alimony payments but not on the child support provided in the Property Settlement Agreement and divorce decree. Jacquelene received a copy of this letter from Ingwald at or about the time it was written. As originally drafted, the Property Settlement Agreement provided for support payments of $600 per month for 121 months. Jacquelene's attorney questioned the adequacy of $600 per month alimony because Jacquelene would have to pay tax on this alimony. Ingwald's accountant calculated that the additional amount Jacquelene needed to pay her taxes was approximately $145 per month. *265 Accordingly, $145 per month for taxes was added to the proposed $600 per month alimony, resulting in $745 per month alimony, the amount incorporated in the final Property Settlement Agreement and the divorce decree. Ingwald's accountant advised Ingwald and his attorney to specify in the Property Settlement Agreement that the periodic payment to Jacquelene continue for 121 months in order to meet the requirements of section 71 of the Internal Revenue Code. During the course of divorce and property settlement negotiations the parties disagreed as to the values attributable to various items of community property. Agreement as to exact value was never reached regarding numerous items. The settlement reached was not based on precise values being agreed upon and assigned to each individual item of property. In December 1962 Jacquelene obtained an appraisal of the Mill Engineering Property showing a total value of $192,500. After subtracting the debt secured by an outstanding mortgage on the property, this appraisal established the value of the community one-half interest in the Mill Engineering Property at approximately $55,000. The parties agreed that the value *266 of the family home was $30,000, less an outstanding mortgage debt of $7,000; the value of the household furnishings was $2,000; the value of the Orcas Island vacation home was $19,000; and the value of the undivided one-half contract vendee's interest in the unimproved waterfront lots on Orcas Island was $2,500. Ingwald and Jacquelene believed that the community interest in the Vancouver Gear Works was worth $1,750, but that their interest in Renton Engineering had a negative value of $20,000 due to the existence of a contingent liability of that amount. They placed the cash surrender value of the life insurance policy on Mantel at approximately $11,000. Ingwald and Jacquelene agreed that the interest in the former Mantel Gear Works partnership had no value because all interest in the partnership had been transferred to Mantel Gear Works, Inc. on its incorporation in January 1962. Ingwald and Jacquelene could not, however, agree on the value of the 998.5 shares of stock in Mantel Gear Works, Inc. A number of factors existed at the time of the divorce which affected the value of the community one-half interest in the Mantel Gear Works, Inc. These factors included the following: (a) *267 Ingwald and Jacquelene did not have a controlling interest in the company; (b) Mantel, who also owned 998.5 shares of stock of Mantel Gear Works, Inc., suffered from alcoholism and was seriously ill, which created internal and external problems for the business; (c) the property on which the business was located was under threat of condemnation and the business would have to be relocated; (d) the business had a very poor cash position; (e) the business was producing a very poor rate of return; and (f) due to the business and personal problems Ingwald was experiencing, he was himself displaying some instability. The value of the community interest in the closely held stock of Mantel Gear Works, Inc. on the date of divorce was worth $100,000. The Property Settlement Agreement which was incorporated in the decree of divorce awarded Jacquelene the Mill Engineering Property, the family home and household furnishings, the family vacation home on Orcas Island, $2,000 cash, and $550 for her attorney's fees and costs. Ingwald was awarded the undivided one-half of a contract vendee's interest in two unimproved waterfront lots on Orcas Island, the community interest in Vancouver Gear Works, *268 the community interest in Renton Engineering, the life insurance policy on the life of Mantel, the community interest in Mantel Gear Works partnership, and the 998.5 shares of stock in Mantel Gear Works, Inc. Furthermore, in connection with the Property Settlement Agreement and the decree of divorce, Ingwald assumed liability for the payment of promissory notes aggregating $37,000. This division of community property was intended by the parties to be totally dispositive of the issue. Under the Property Settlement Agreement and divorce decree Ingwald received no more than one-half of the community property. Approximately one year after the divorce, on April 1, 1964, Mantel sold his remaining one-half of the Mantel Gear stock to Ingwald for $225,000. This figure, however, was not reflective of the fair market value of Mantel's stock. The business was plagued with constant internal strife and Ingwald paid this excessive price only due to the clear need to terminate Mantel's stock ownership in the business. The terms of sale called for installment payments over 15 years and a sub-market rate of interest. The monthly $745 payments made by Ingwald to Jacquelene, pursuant to the divorce *269 decree, were deducted by him from his gross income for each of the years in issue. These payments were included by Jacquelene in her gross income in 1963, 1964, 1965, 1966 and 1967. However, Jacquelene changed her method of reporting these payments. Commencing with 1968 and in each year thereafter, Jacquelene did not include them in her gross income. In February 1970 she filed a claim for refund for overpayment of her 1967 taxes. Jacquelene married Byron J. Sample on January 17, 1965. Mr. Sample died on March 25 of the same year. Jacquelene subsequently married Carl Siegel on July 27, 1967. ULTIMATE FINDING OF FACT The $745 monthly payments made by Ingwald to Jacquelene beginning March 1963, were made in discharge of his obligation to support Jacquelene which was incurred because of the marital relationship and were not consideration for community property rights. OPINION Prior to their divorce on March 5, 1963, Ingwald and Jacquelene, through legal counsel, had engaged in extensive negotiations concerning division of their community property, child support and wife support payments. They ultimately agreed that Ingwald would make 121 monthly $745 payments to Jacquelene for *270 her support. This was set forth in the Property Settlement Agreement and incorporated in the divorce decree. These monthly $745 payments were deducted by Ingwald pursuant to section 215 [4] in each of the years in issue. These same payments were included by Jacquelene in her gross income for each of the years 1963, 1964, 1965, 1966 and 1967 in accordance with section 71(a)(1). [5] Commencing with 1968 and in each year thereafter, however, Jacquelene no longer included these payments in her gross income, maintaining that the payments were consideration for her share of the community property which she had not received upon the division of community property. Having changed her characterization of these payments, she filed a claim for refund in February 1970 for overpayment of her 1967 taxes. *271 Respondent, assuming the position of stakeholder, assessed inconsistent deficiencies against both parties. Respondent, however, contends that the payments are alimony, deductible to Ingwald and taxable to Jacquelene, and we agree. "Whether the payments in fact represent alimony or are in consideration of petitioner's interest in the community property is a question that turns upon the facts, and not upon any labels that may or may not have been placed on them." Ann Hairston Ryker,33 T.C. 924, 929 (1960). Ingwald did not receive more than half of the community property at the time of the divorce. This fact is inconsistent with characterizing the monthly payment to Jacquelene as compensation for unreceived community property. Blanche Curtis Newbury,46 T.C. 690 (1966). The Property Settlement Agreement stated that the monthly payments to Jacquelene were for her support. All the individuals involved in the property settlement negotiations (including Jacquelene's own lawyer) except Jacquelene testified at trial that these payments were for Jacquelene's support. This testimony--which required the waiving by both parties of the lawyer-client privilege--clearly *272 shows the true intent of the parties. All (except Jacquelene) agreed that the "support" designation was not subterfuge, but was an accurate reflection of the true nature of the payments. See West v. United States,332 F. Supp. 1102 (S.D.Tex., 1971), affirmed percuriam477 F. 2d 563 (C.A. 5, 1973). The Property Settlement Agreement intentionally specifies 121 monthly payments in order that the payments qualify as support taxable to Jacquelene. See section 71(c) (2). The support payments were in fact calculated by counsel on the assumption that they would be taxable to Jacquelene. See West v. United States,supra.Jacquelene's testimony that she has no recollection of any conversations with her lawyer, Ingwald or his representatives identifying the payments as for her support or regarding taxability thereof to her is not persuasive, particularly in view of her uncomplaining payment of taxes thereon for several years until her marriage to Carl Siegel. The fact that the support payments were to continue beyond Jacquelene's remarriage does not affect their status as support where, as here, under state law [6] alimony *273 payments may continue on remarriage if the parties so agree. [7]
Decision will be entered for petitioners in Docket Number 7442-72.
Decision will be entered for the respondent in Docket Number 7460-72.
Footnotes
1. All section references are to the Internal Revenue Code as in effect during the years in issue.↩
2. The balance of said shares was owned by Lee Mantel, business associate and former partner of Ingwald. This corporation was formed on January 5, 1962, and succeeded to the assets and business of Mantel Gear Works, a partnership composed of Ingwald and Mantel.↩
3. Now Judge Hamilton of the State of Washington Superior Court, Kitsap County.↩
4. Section 215 provides in part: In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71↩ in the gross income of his wife, payment of which is made within the husband's taxable year. 5. Section 71(a)(1) provides: Decree of divorce or separate maintenance.--If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.↩
6. Fisch v. Marler,1 Wash. 2d 698, 711, 97 P. 2d 147, 153 (1939); accord Moore v. Moore,71 Wash. 2d 547, 429 P. 2d 877↩ (1967). 7. Irving J. Hayutin,T.C. Memo 1972-127. (31 T.C.M. 509↩, 569; 1972 P-H T.C. Memo [*$ 72,127 at page 594-72.)